UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| AMERICAN NATIONAL FIRE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 2:06-cv-200-S |
| YORK COUNTY, | ) ) | |
| Defendant. | ) ) | |

**RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT**

American National Fire Insurance Company (ANFIC) brings this action seeking a declaratory judgment in regard to its obligations under a contract of insurance that provided law enforcement liability coverage to York County.  In Nilsen v. York County, a judgment entered against York County and in favor of a class of plaintiffs following a negotiated settlement.  ANFIC maintains that it does not owe York County any insurance proceeds because the policy's $5,000 per claim deductible is less than the amount received by each class member in the underlying class action.  The parties dispute whether the language of the coverage form calls for this result.  York County additionally contends that, even if it does, ANFIC should be estopped from asserting the deductible based on the way the underlying settlement played out.  I recommend that the Court construe the policy in the manner advocated by ANFIC, but withhold judgment for further findings on York County's estoppel defenses.  If the Court adopts this recommended decision, York County's motion for summary judgment (Docket No. 28) will be denied, and ANFIC's motion (Docket No. 26) will be granted in part, but

1

judgment will not enter on behalf of ANFIC, pending resolution of the issues related to the estoppel defense.

### Facts

The following statement of facts is drawn from the parties' Local Rule 56 statements of material fact in accordance with this District's summary judgment practice. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).  When a statement offered by a party is uncontested and is supported by a citation to record material having evidentiary quality, the statement has been set forth herein essentially as offered.  When a statement of fact is contested and the evidentiary record is capable of supporting alternative findings of fact, the statement in dispute must be characterized, for purposes of summary judgment only, in the manner favorable to, or favored by, a non-movant. Merch. Ins. Co. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

American National Fire Insurance Company (ANFIC) insured York County for Law Enforcement Liability (LEL) from November 1, 1996, to November 1, 1997, and November 1, 1997, to January 1, 1998, comprising a 14-month period.  (Pl.'s Statement of Material Facts (PSMF) ¶ 1, Doc. No. 27; Def.'s Statement of Material Facts (DSMF) ¶ 2, Doc. No. 29.)  In October 2002, a civil rights class action lawsuit was commenced in this Court against York County seeking injunctive and monetary relief on account of certain strip search practices observed at the York County Jail.  (PSMF ¶ 2; DSMF ¶ 1; see Nilsen v. York County, 02-212-P.)  The class certified in that action was as follows:

> All people strip-searched at the York County Jail after October 14, 1996, under a policy or custom of conducting strip-searches without evaluating

individualized reasonable suspicion: (1) while waiting for bail to be set or for a first court appearance after being arrested on charges that did not involve a weapon or drugs or a violent felony; or (2) while waiting for a first court appearance after being arrested on a default or other warrant that did not involve a weapon or drugs or a violent felony.

(Dec. 18, 2003 Order in Nilsen, 02-212-P.)

The LEL Policy issued by ANFIC states that there is a $5,000 deductible for each claim.  The Policy does not define the term "claim."  (DSMF ¶¶ 55-58.)

On September 20, 2004, and September 29, 2004, all parties and counsel in the Nilsen matter participated in a mediation session.  (Id. ¶ 6.)  Attorney Peter T. Marchesi was lead counsel and primary negotiator for York County.  (Id. ¶¶ 5, 9.)  Attorney Gene Libby also represented York County in the mediation.  (Id. ¶ 8.)  William Curtin, a divisional claims examiner, participated in the mediation as the representative for ANFIC.  (Id. ¶ 7.)

ANFIC participated in the defense of York County under a reservation of rights letter dated January 22, 2004.  (PSMF ¶¶ 4-5; DSMF ¶ 10; see Curtin Dep. Ex. 5 ("Reservation Letter"), Doc. No. 29-4 at 19-26.)  The letter was addressed to County Manager David Adjutant.  (Reservation Letter at 1, Doc. No. 29-4 at 19.)  Mr. Curtin authored the letter and asserted therein that the deductible language of the policy meant that the $5,000 deductible applied to each claim.  (DSMF ¶ 11;  Reservation Letter at 6-7, Doc. No. 29-4 at 24-25.)  Based on this assertion Mr. Curtin wrote:  "Therefore, . . . [ANFIC] will be participating in the defense of York County under a full Reservation of Rights."  (Reservation Letter at 7, Doc. No. 29-4 at 25.)  In addition to the Reservation Letter, during the September 20, 2004, mediation session, Mr. Curtin verbally reasserted ANFIC's position that the deductible applied to each member of the class.  (DSMF ¶ 14.)

3

Notwithstanding this position, ANFIC did offer to contribute money to facilitate a settlement.  In opposition to ANFIC's position, York County voiced the opinion that the deductible applied only once to the entire class and articulated that position in a letter authored by Attorney Libby following the initial mediation session.  (Id. ¶¶ 12, 15;  Sept. 24, 2004 "Curtin Letter," Doc. No. 29-3, Ex. 1.)  ANFIC responded through its counsel, Attorney David Dowd, who authored a letter articulating the "per claim" perspective and rejecting a demand for the entire $1 million policy limit.  (DSMF ¶ 16;  Sept. 27, 2004 "Dowd Letter," Doc. No. 29-4 at 27.)  Dowd's September 27, 2004, letter was not copied to Attorney Marchesi or the parties to the settlement negotiations.  (DSMF ¶ 17.)

During the second mediation session on September 29, 2004, Curtin again represented ANFIC.  Attorney Dowd was not in attendance.  (Id. ¶ 18.)  Curtin indicated that ANFIC was prepared at that time to offer $650,000 to a settlement pool of $2.25 million.  (Id. ¶ 19; Pl.'s Opposing Statement of Material Facts (POSMF) ¶ 19, Doc. No. 35.)  According to Attorney Marchesi, Mr. Curtin did not reiterate ANFIC's position respecting the deductible at that time.  (DSMF ¶ 20.)  In any event, the mediation did not resolve the case.

Shortly thereafter, on October 15, 2004, Attorney Marchesi made a $2.9 million settlement offer which anticipated a $650,000 contribution from ANFIC.  (Id. ¶ 22.)  On October 18, 2004, Mr. Curtin wrote to Attorney Marchesi and asserted that Attorney Marchesi was not authorized to make settlement offers based on a $650,000 contribution from ANFIC unless the total settlement offer matched or exceeded $3.25 million.  (Id. ¶ 23;  Oct. 18, 2004 Curtin Letter, Doc. No.29-3, Ex. 2.)  Attorney Marchesi disputed Mr. Curtin's position, but withdrew the $2.9 million offer.  (DSMF ¶¶ 25-26.)  The settlement

4

withdrawal prompted a fax from Attorney Libby to Mr. Curtin dated October 19, 2004, and a renewed demand for the policy limit of $1 million.  (Id. ¶ 27.)

On October 21, 2004, Attorney Marchesi received a letter from Attorney Dowd on behalf of ANFIC.  (Id. ¶ 28; Oct. 21, 2004 Dowd Letter, Doc. No. 29-3, Ex. 5.)  Attorney Dowd's October 21, 2004, letter rejected Marchesi's demand for the policy limits of $1 million.  However, Dowd did authorize Marchesi to use the $650,000 ANFIC contribution toward a settlement package.  (DSMF ¶ 29.)  Dowd's October 21, 2004, letter was copied to all counsel and to David Adjutant, the York County Manager.  (Id. ¶ 30.)  The concluding sentence of the concluding paragraph reads as follows:

> Though the number of claimants per occurrence during the period [ANFIC] was on the risk remains indeterminate, it is clear that [ANFIC]'s exposure over the deductibles will be substantially less than $996,500, when the deductible each claim is applied to the sums payable to each claimant.

(Doc. No. 29-3 at 12.)  Also on October 21, 2004, Attorney Dowd faxed a letter to Attorney Libby in response to Libby's October 19, 2004, fax to Curtin.  (DSMF ¶ 31.) Dowd's October 21, 2004, letter to Libby asserted that the $5,000 deductible applied "per claim" and stated: "Should any [ANFIC] expenditure address any loss within the applicable deductible each claim, [ANFIC] reserves its rights to seek reimbursement from York County to that extent."  The letter was not copied to other counsel or to Attorney Marchesi.  (Id. ¶¶ 32-33.)

On November 23, 2004, Attorney Marchesi wrote to class counsel and copied Attorney Dowd to confirm a "tentative settlement agreement . . . of $3.3 million" with six express terms.  (Id. ¶ 34.)  Also on November 23, 2004, Attorney Marchesi wrote to County Manager David Adjutant and the representatives of all the insurers, including

Attorney Dowd, to confirm each insurer's participation in the settlement (Risk Pool $2.4 million, ANFIC $750,000, Twin Cities Insurers Company $100,000, and York County $50,000) and to set forth all additional terms as to settlement with the class.  (Id. ¶ 35; POSMF ¶ 35.)  Curtin authorized Attorney Dowd to convey to Attorney Marchesi a settlement contribution of $750,000 from ANFIC.  (DSMF ¶ 39.)  Curtin did not request that Attorney Dowd convey any conditions or reservations to ANFIC's offer, and Dowd did not verbally attach any reservations to the $750,000 verbal offer to Attorney Marchesi, vis-à-vis reclaiming or recovering the settlement contribution paid on behalf of York County ($750,000).  (Id. ¶ 40.)  Attorney Marchesi asserts that, had he known of ANFIC's reservation of rights against York County, his settlement letter would have referred to it.  (Id. ¶ 36.)  At no time was Attorney Marchesi advised by Mr. Curtin, Attorney Dowd, or any other representative of ANFIC that ANFIC's $750,000 contribution to the Nilsen settlement carried with it a reservation of rights or condition asserting a right to reclaim or recoup the entire contribution from York County.  (Id. ¶ 37.)  Neither Mr. Curtin nor Attorney Dowd communicated to Attorney Marchesi in any fashion after the November 23, 2004, settlement confirmation letter that ANFIC reserved the right to recover the settlement contribution of $750,000 from York County.  (Id. ¶ 42.)

On or about February 1, 2005, ANFIC sent a $750,000 check to contribute to the settlement of the Nilsen matter and did not attach any reservation of rights.  (Id. ¶ 44.)  In consideration for ANFIC's $750,000 contribution to the settlement, the plaintiffs in the Nilsen matter signed a release freeing ANFIC of further liability.  (Id. ¶ 45.)  The release in the Nilsen settlement specifically lists ANFIC as a releasee.  (Id. ¶ 46.)

ANFIC claims it contributed $750,000 to the Nilsen settlement under a "reservation of rights" and identifies the following correspondence to have preserved these rights, in addition to verbal communications:

 a. January 20, 2004, initial reservation of rights letter;

 b. September 27, 2004, letter from Attorney David Dowd to Attorney Libby (not copied to Attorney Marchesi);

 c. October 21, 2004, letter from Attorney Dowd to Attorney Libby (not copied to Attorney Marchesi);

 d. October 21, 2004 letter from Attorney Dowd to Attorney Marchesi.

(Id. ¶ 47.)

ANFIC has adjusted one other class action lawsuit involving strip searches, the so-called Plymouth County matter.  (Id. ¶¶ 48-49.)   In that matter, ANFIC issued the same policy form as in this case.  (Id. ¶ 50.)  There, Mr. Curtin sent a letter to the insured memorializing the settlement with an express reservation of rights with respect to the deductible issue.  (Id. ¶ 51.)  The letter from Curtin to Plymouth County stated in pertinent part:

 The remainder of the settlement amount ($1,044,001) falls within the scope of the Great American Insurance Company policies with the Sheriff's Department.

 As you are aware, there remains a dispute as to the application of the per claim deductible under the respective Great American policies applicable in this matter. At this time, I would ask that you advise me within 7 days of receipt of this correspondence as to whether you disagree with the apportionment of settlement amounts proposed above.

 Should you not provide any type of written objection, this will constitute an agreement as to the settlement amounts and Great American will proceed with finalizing the terms of the settlement and obtaining appropriate releases on behalf of the Sheriff's Department and its employees in the pending class action litigation.

(Id. ¶ 52.)

ANFIC's practice is to assign multiple feature codes, a three-digit extension to the claim number, to actions that have multiple claims.  (Id. ¶ 68.)  ANFIC set up only a single claim number for the Nilsen matter and only one feature number. (Id. ¶¶ 69-70.)

The class in the Nilsen matter consisted of approximately 1,410 claimants, even though there were 2397 bookings during the disputed period.  (Id. ¶ 73.)  There were approximately 311 bookings in total in 1996 and 1997.[1]  (Id. ¶ 75.)

Pertinent provisions of the policy read as follows[2]:

## SECTION I – LAW ENFORCEMENT LIABILITY COVERAGES

### A.     Insuring Agreement

We will pay those sums that the Insured becomes legally obligated to pay as damages because of "wrongful act(s)" which result in:

1.  personal injury;
2.  bodily injury;
3.  property damage;

caused by an "occurrence" and arising out of the performance of the Insured's duties to provide law enforcement activities.

. . . .

We will have the right and duty to defend any "suit" seeking those damages.  But:
. . .
2.  we may, at our discretion, investigate any "wrongful act" and settle any claim or "suit" that may result . . . .

---

[1]      The parties speak of a class containing hundreds of members *in toto*.  ANFIC speaks of 274 class members for its coverage period and would like to multiply its $5,000 deductible by that number to swallow up its $750,000 contribution to the settlement.  (See Complaint Ex. C, Doc. No. 1-4.)
[2]      The legal issue presented by ANFIC necessarily requires a review of the Policy.  I have engaged in a review and have collected herein some of my observations apropos the LEL policy form and related endorsements.  The LEL Coverage Form is found at pages 81-85 of the Policy as it is reproduced at docket number 27-3.

The insured shall not, except at his own cost and for this [sic] own account, make any payment, admit any liability, settle any claim, assume any obligation or incur any expense without our written consent.

**B.      Exclusions**

This insurance does not apply to:

. . . .

5.  Claims arising out of the performance of any act or service of police duty for anyone other than the Named Insured.  . . . .
. . . .
6.  Claims arising out of the official employment policies or practices of the Insured, including but not limited to claims due to demotion, selection, dismissal, failure to promote, etc.
. . . .
7.  . . . [C]laims of injury arising out of the acts of fraud committed by or at the direction of the Insured . . . .
8.  Any actions, claims, "suits" or demands seeking relief or redress in any form other than money damages . . .;  however, the Company will afford defense to the Insured for such actions, claims, "suits" or demands, if not otherwise excluded, where compensatory damages are requested.

**C.      Supplementary Payments**

We will pay, with respect to any claim or "suit" we defend:

1.  all expenses we incur;
. . .
3.  all reasonable expenses incurred by the Insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings . . . .

**SECTION III – LIMITS OF INSURANCE**

**A.**  The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:
. . .
2.  claims made or "suits" brought; or
3.  persons or organizations making claim or bringing "suits."

**B.** The Limit of Insurance shown in the Declarations applicable to each "occurrence" is the most we will pay for all claims arising out of the same act or interrelated acts of one or more of the Insureds. . . . .

## SECTION IV – LAW ENFORCEMENT LIABILITY CONDITIONS

. . . .

### B. Deductible

The deductible amount stated in the Declarations, if any, is applicable to each claim and shall be subtracted from the total amount of money damages and claims expenses including:

1.  loss payments, and

2.  investigation, adjustment, defense and/or appeal expenses, whether or not loss payment is made,

resulting from each claim and the Company shall be liable only for the difference between such deductible amount and the amount of insurance otherwise applicable to each claim.

### C. Duties in the Event of "Wrongful Act," Claim or "Suit"

1.  You must see to it that we are notified as soon as practicable of a "wrongful act" which may result in a claim. . . . .
2.  If a claim is received by any Insured, you must:
     a.  immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";
     . . .
     c.  cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

### D. Legal Action Against Us

. . . .

A person or organization may sue us to recover on an agreed settlement . . . An agreed settlement means a settlement and release of liability signed by us, the Insured and the claimant or the claimant's legal representative.

. . . .

**I. Settlement**

We shall not settle any "suit" without the insured's consent.  If, however, the Insured refuses to consent to any settlement received by us, and shall elect to contest the claim or continue any legal proceedings in connection with such claim, our liability for the claim shall not exceed the amount of which the claim could have been so settled . . . .

**SECTION V – DEFINITIONS**

. . . .

3.  **"Occurrence"** means an event, including continuous or repeated exposure to substantially the same general harmful conditions
. . . .
6.  **"Suit"** means a civil proceeding in which damages to which this insurance applies are alleged.  "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent.

(LEL Policy, Doc. No. 27-3 at 81-85.)

The Policy includes an endorsement relevant to the Maine Tort Claims Act.  It provides, with respect to the LEL coverage form, among other forms, that coverage "is limited to those claims and causes of action for which governmental immunity has been expressly waived."  (Id. at 16.)

**Discussion**

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required."  Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  Merchants Ins. Co., 143 F.3d at 7.  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trialworthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

ANFIC's summary judgment motion advances the position that the $5,000 per claim deductible contained in the LEL Policy applies to each individual claimant in the Nilsen class action.  (Pl.'s Mot. Summ. J. at 4-12, Doc. No. 26.)  York County's summary judgment motion advances the separate legal question of whether ANFIC's conduct during settlement negotiations should estopp it from asserting the per claim deductible, though it also requests summary judgment against ANFIC on the deductible question.  (Def.'s Mot. Summ. J. at 8-15, Doc. No. 28.)  I address the "claim" terminology first and then consider the County's estoppel argument.

**A.     As used in the LEL Coverage Form, "claim" means a third-party assertion of liability for wrongful acts arising from an occurrence; in the class action context, there are multiple claims and multiple deductibles.**

The function of the court "is not to make a new contract for the parties by enlarging or diminishing its terms, but is to ascertain the meaning and intention of [the contract] *actually made*."  Apgar v. Commercial Union Ins. Co., 683 A.2d 497, 500 (Me. 1996) (citations and internal quotation marks omitted) (emphasis in original).  "In Maine,

courts first examine relevant policy language to determine whether it is unambiguous; if so, it is enforced as written." W. World Ins. Co. v. Am. and Foreign Ins. Co., 180 F. Supp. 2d 224, 230 (D. Me. 2002). Language of an insurance contract is ambiguous only if it is reasonably susceptible to more than one plausible interpretation when measured "from the viewpoint of 'an average person, untrained in either the law or the insurance field, in light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured.'" Peerless Ins. Co. v. Wood, 685 A.2d 1173, 1174 (Me. 1996); see also Am. Employers' Ins. Co. v. DeLorme Pub. Co., Inc., 39 F. Supp. 2d 64, 82 (D. Me. 1999). Whether ambiguity exists and the meaning of an insurance contract are questions of law. Foremost Ins. Co. v. Levesque, 2005 ME 34, ¶ 7, 868 A.2d 244, 246.

Before addressing the particular wording of the LEL Coverage Form, I note that there exists an assortment of published opinions and orders addressing the application of deductible provisions in the context of class action lawsuits. Some of those decisions have found ambiguity to exist. See, e.g., Previews, Inc. v. Cal. Union Ins. Co., 640 F.2d 1026, 1029 (9th Cir. 1981) (following Beaumont-Gribin-Von Dyl Mgmt. Co. v. Cal. Union Ins. Co., 63 Cal. App. 3d 617 (Cal. Ct. App. 1976), but speaking of the Court's "obligat[ion] to follow the California court's interpretation of [the] very same contract"). Others have not. See, e.g., Vargas v. Hudson County Bd. of Elections, 949 F.2d 665, 675 (3d Cir. 1991). The cases turn, naturally, on the particular language in question and, therefore, are not particularly useful for purposes of construing the LEL Coverage Form, which I turn to now.

The subject LEL Coverage Form uses seemingly straight-forward terminology to phrase the deductible provision:

> The deductible amount stated in the Declarations, if any, is applicable to each claim and shall be subtracted from the total amount of money damages and claims expenses . . . .

In the Nilsen matter many claims were brought on behalf of many claimants in a single class action, governed by Rule 23 of the Federal Rules of Civil Procedure.  Rule 23 provides for the joinder of many claimants in a single action when their respective claims predominantly involve common questions of fact and law.  The Rule serves the ends of expediency and consistency, because many individual claimants could potentially flood the Court with independent lawsuits and many individual trials could lead to inconsistent results that are unfair to particular claimants and that fail to impose a consistent standard of conduct on the defendant.  Fed. R. Civ. P. 23.

York County contends that the "each claim" language of the LEL Policy is ambiguous because it does not spell out what happens when many claims are presented simultaneously through the vehicle of a class action lawsuit.  In York County's words:

> The fact that "claim" is an undefined term and that the Policy is silent on how the "per claim" deductible should be interpreted in a class action leads inevitably to several different interpretations.  Since the term "claim" is reasonably susceptible to different interpretations, Maine law requires the insurance contract be construed in favor of the insured, York County.

(Def.'s Opposition at 1, Doc. No. 32.)  The most persuasive argument that York County advances for this contention comes from a Massachusetts case involving the above-referenced Plymouth County matter and the very same LEL Coverage Form.  There, the Massachusetts Superior Court concluded that the term claim is ambiguous because it could refer to either the many claims of the individual claimants in a class action, or to

14

the solitary "claim for coverage" made by the insured.  <u>Great Am. Ins. Co. v. Plymouth County Sheriff's Dept.</u>, No. 06-1160-BLS2 at 5 (Mass. Sup. Ct. Aug. 27, 2007.)[3]  In York County's view, the fact that a superior court justice made this finding "establishes, *a fortiori,* there is <u>more than one</u> reasonable interpretation of the term 'claim'."  (Def.'s Opposition at 5.)  I am not persuaded by this line of reasoning.

Based on my reading of the LEL Coverage Form, I conclude that essentially every use of the word "claim" is in a context that makes it apparent that the word refers to a third party claim.  I am therefore at a loss as to how a reasonable interpretation of this term, construed based on a comprehensive reading of the LEL Coverage Form, would extend so far as to include a claim for coverage made on behalf of the insured.  Not a single reference in the LEL Coverage Form conveys or even suggests the latter meaning.  In Section I.A, the insured is prohibited from settling any claim without ANFIC's consent.  This particular reference to claim clearly does not involve any claim by the insured, only the settlement of a third-party claim.  Insureds do not settle their own claims for insurance, so this prohibition would have no meaning if the proposed alternative construction were employed.  Section I.B speaks of a variety of claims that are excluded from coverage.  Again, the meaning is plain that the excluded claims are third-party claims arising out of specified conduct on the part of the insured.  A claim for insurance proceeds does not simply arise out of the insured's wrongful acts.  A third-party claim does.[4]  Section I.C is written in terms of claims the company will defend.  It

---

[3]       This order is attached to York County's opposition statement.  (See Doc. No. 33-9.)

[4]       The Superior Court concluded that subdivision 8 of Section I.B generated ambiguity because the word claim was used in conjunction with the word demand, and that might suggest that a claim for relief is distinguishable from a demand for relief.  (Doc. No. 33-9 at 5.)  Here is the LEL Coverage Form language:

This insurance does not apply to: . . .

makes no sense in this section to construe "claim" as a claim by the insured because the company would not offer a defense to the insured for such a claim.  The limits of liability stated in Section III.A are drawn in terms of claims made or suits brought by third-party persons or organizations, not claims made by the insured.  Likewise, in Section III.B the term claim is used in relation to "claims arising out of" certain conduct by the insured, which is inconsistent with a construction of claim as a claim by the insured.  The same meaning applies in section IV.C, which addresses the insured's duty to notify the company when a claim is made against the insured.   An insured's claim for insurance is obviously not made against the insured and there would be no need to give notice of a claim for insurance, since the claim for insurance would serve as notice.  Section IV.I conveys the same meaning; the insured may in some circumstances contest a claim.  It makes no sense to speak of an insured contesting its own claim for insurance.  Finally, looking beyond the LEL Coverage Form, the Maine tort claims endorsement limits LEL coverage to "those claims and causes of action for which governmental immunity has been expressly waived."  Again, it is apparent that the term claim is being used to describe third party claims.  In none of these instances would it make any sense to construe the term claim to mean a claim for insurance raised by the insured.  Nonsensical constructions are not plain meaning constructions.  The consistent and repeated usage of the term claim to denote third party claims against the insured should reasonably inform

---

Any actions, claims, "suits" or demands seeking relief or redress in any form other than money damages . . .;  however, the Company will afford defense to the Insured for such actions, claims, "suits" or demands, if not otherwise excluded, where compensatory damages are requested.

A plain interpretation of this provision is that the policy is meant to apply only to actions, claims, "suits" or demands *for* money damages.  A claim or demand for insurance coverage is distinct from a claim or demand for money damages.  Additionally, this provision speaks of providing a defense against such actions, claims, "suits" or demands.  An insurer does not provide a defense to its insured on a claim or demand for insurance proceeds.

the construction to be given to the usage of the term claim in the deductible provision.  It
is not reasonable to lift the deductible provision out of this context to theorize whether an
alternative meaning might make sense in a vacuum.  This is perhaps the only long-
established rule of law that applies in this case.  See Am. Prot. Ins. Co. v. Acadia Ins.
Co., 2003 ME 6, ¶ 11, 814 A.2d 989, 993 ("[T]here is a long-standing rule in Maine,
which provides that: A contract of insurance, like any other contract, is to be construed in
accordance with the intention of the parties, which is to be ascertained from an
examination of the whole instrument.  All parts and clauses must be considered together
that it may be seen if and how one clause is explained, modified, limited or controlled by
the others.").  The construction proposed by York County would not make sense in any
of the passages I have addressed thus far, which tends to suggest that it is not a
reasonable alternative construction.

In a handful of additional references the LEL Coverage Form uses the term claim
in conjunction with the term suit.  In Section I.A.2, Section I.C, Section III.A.2 & 3, and
Section IV.C.2.a, the LEL Coverage Form is written in terms of a "claim or 'suit'."
Section I.A.2 is addressed to the insurer's ability to investigate and settle claims or suits.
It makes no sense to speak of claim in this context as meaning a claim for insurance.
Section I.C is addressed to any claim or suit the insurer defends.  It makes no sense to
speak of claim in this context as meaning a claim for insurance.  A review of Sections
III.A.2 & 3 and IV.C.2.a leads to the same conclusion.  Moreover, a plain reading of this
"claim or 'suit'" language reflects an important relationship between "claim" and "suit."
A suit, which is defined, obviously applies once a claim is brought against the insured in
the context of a formal civil action or an arbitration proceeding.  A claim, in contrast, is

naturally understood in association with the term suit to extend to a third party claim made in advance of litigation, though a claim would endure even after a suit is commenced.  A plain, common-sense reading of the disjunctive "or" also calls for a natural inference that the terms are related in the following way:  they both refer to alternative means by which a third party might present a claim.  Construing the term as an insured's claim for insurance coverage renders the associated language awkward, especially when one tries to correlate such usage of the term with the usage in the many associated provisions previously discussed.  A strained reading is not a plain reading.

York County argues that "[e]ven when a policy specifically defines 'claim,' Maine courts have found that the term is ambiguous."  (Def.'s Opposition at 17.)  The solitary precedent York County cites is Maine Health Alliance v. Medical Mutual Insurance Company of Maine, No. CV-02-133, 2003 WL 21387158, 2003 Me. Super. LEXIS 101 (Me. Sup. Ct. May 20, 2003).  In that case the Court did not really construe the term claim, but rather ruled that the policy in question afforded a defense for a "claim for loss," and not just a "claim for damages," because the policy expressly afforded coverage for "all loss which the insureds shall be legally obligated to pay as a result of any claim" and the term claim was defined to include "any occurrence which the insured believes may subsequently give rise to a claim as a result of a wrongful act."  2003 WL 21387158, *2, 2003 Me. Super. LEXIS 101, *5-6.  Consequently, the Court did not really find that the term claim was ambiguous, but rather that the policy created ambiguity as to the availability of a defense since the scope of coverage was so broad but the duty to defend provision was written only in terms of a "claim *for damages*."  Id.  In other words, the case is not on point.

York County also argues that the meaning of claim becomes ambiguous when one attempts to construe it in the context of a class action lawsuit.  (Def.'s Opposition at 6.)  I disagree.  The Nilsen class action was quite clearly a "suit."  Within that suit, each of the many members of the Nilsen class had a claim arising from one or more strip search occurrences.  Each claimant's claim, if presented independently, would plainly be subject to the $5,000 deductible.  Those claimants did not lose their claims simply because they consented to have Ms. Nilsen serve as their representative in the class action suit.  It would be pure fiction to pretend that all of these claims were somehow transformed into only so many claims as the number of legal grounds that class counsel articulated in the Nilsen pleadings.  Yet that is what York County contends; that there is only one claim here because class counsel put one count in the underlying complaint.  It is simply not a reasonable construction of the LEL Coverage Form to treat the particular usage of the term claim in that fashion, particularly as claim is elsewhere differentiated from "suit."  A fictional construction does not present a reasonable alternative construction. Additionally, the fact that an insurance contract might prove somewhat difficult to understand in a particular context does not render it ambiguous.  Colford v. Chubb Life Ins. Co. of Am., 687 A.2d 609, 614 (Me. 1996) ("Mere hope of coverage by the insured, or inability of the insured to understand the policy, does not render the contract ambiguous.").  If there is any difficulty understanding the term claim in the class action scenario, it is only because York County is pitching a construction that makes no sense. A common sense, plain meaning construction of the term claim does not render the class action context problematic.

Finally, York County argues that the term claim is ambiguous because ANFIC used the term in a different fashion in one sentence in its summary judgment motion and assigned only one claim number to the Nilsen matter, and because Mr. Curtin opined that a dictionary would be of little use if someone tried to "define 'claim' in relation to a class action suit."  (Id. at 6-7.)  None of these points really addresses the question of whether the meaning of claim is plain from an in-context review of the LEL Coverage Form.  There is no rule that a quick reference to the dictionary must be dispositive in order to avoid a finding of ambiguity, especially as many words have multiple meanings, depending on context.[5]  Cf. Patrons Oxford Mut. Ins. Co. v. Marois, 573 A.2d 16, 19 (Me. 1990) ("There are many words, phrases or paragraphs in a standard insurance contract that a first time reader does not understand.  That circumstance does not justify excising such provisions from the contract.") (footnote omitted).  Nor do ANFIC's administrative processes impinge upon a plain reading of the Policy.[6]  A plain reading is not to be muddled by extrinsic evidence.  Am. Prot. Ins. Co., 2003 ME 6, ¶ 11, 814 A.2d at 993.

Based on a plain reading, I conclude that "claim" does not reasonably refer to a claim by the insured for insurance proceeds or to the number of legal theories or grounds

---

[5]     On the matter of dictionary usefulness, a review of the definition of "class action" would certainly help a layperson construe the LEL Coverage Form in such a context.  This definition is useful, for example:

> **Class action** *n.*  A lawsuit brought by one or more plaintiffs on behalf of a large group of others who have a common interest.

The American Heritage Dictionary of English Language 342 (4th ed. 2000).  A layperson who read this definition would minimally understand that a class action is a suit, not a claim, and there would be no cause to imagine that the commencement of a class action would somehow negate individual claims.

[6]     The Massachusetts Superior Court found this a suitable fallback position.  The problem with the argument is not only that it relies on extrinsic evidence, which is improper where the language is plain, but also that an insurer cannot very readily ascertain the size of a class or the number of potential claimants until sometime after the suit is filed.  After all, it took more than a year for the class to be certified in Nilsen.  Assigning a single administrative claim number seems prudent in this scenario, for the same reason it was prudent of this Court not to assign multiple docket numbers in the Nilsen class action.

set forth in a class action court pleading.  In the context of the LEL Coverage Form, a

claim is simply an assertion by a third party that the insured is liable for a wrongful

act/occurrence.  (LEL Coverage Form Section I.A.)

> The language of the deductible provision is as follows:
>
> B.  Deductible
>
> The deductible amount stated in the Declarations, if any, is applicable to each claim and shall be subtracted from the total amount of money damages and claims expenses including:
>
> 1.  loss payments, and
>
> 2.  investigation, adjustment, defense and/or appeal expenses, whether or not loss payment is made,
>
> resulting from each claim and the Company shall be liable only for the difference between such deductible amount and the amount of insurance otherwise applicable to each claim.

(Id., Section IV.B.)  The only reasonable construction of the deductible provision that is

supported by the full text of the LEL Coverage Form and the related tort claims act

endorsement is that the term "claim" refers to a claim by a third party against the insured

and that the language "each claim" means that, when there are many claims at issue (i.e.,

many third-party assertions of liability for wrongful acts arising from many occurrences),

the deductible applies in a cumulative fashion rather than in a singular fashion, regardless

of whether the claims are presented independently or through the device of a class action

lawsuit.  Based on this language, in the class action context there will necessarily be

multiple deductibles.   The matter of how many does not appear to be established by the

record.

**B.**     **Estoppel**

With its motion for summary judgment York County argues that ANFIC failed to reserve its right to recoup its settlement outlay based on the deductible provision.  (Def.'s Mot. Summ. J. at 8.)  The legal theory behind this argument is estoppel, a bar or affirmative defense that seeks to prevent one from asserting a claim that contradicts one's prior representation or action.  York County cites Maine law to the effect that "[a]n insurer may be estopped from denying coverage when the party claiming coverage has demonstrated (1) unreasonable conduct of the insurer that misleads the insured concerning the scope of his coverage and (2) justifiable and detrimental reliance by the insured upon the insurer's conduct." Me. Mut. Fire Ins. Co. v. Grant, 674 A.2d 503, 504 (Me. 1996) (affirming grant of summary judgment to insurer in the face of estoppel argument).  York County says there is no genuine issue of fact but that "ANFIC's misleading conduct is a combination of deceit and cunning manipulation of the settlement process."  (Def.'s Mot. Summ. J. at 9; see also id. (speaking of "shrewd and sly manipulation".)  Based on my review of the record, I conclude that a genuine issue does exist on the estoppel question.  It is undisputed that ANFIC, through both Mr. Curtin and Mr. Dowd, initially expressed an intention to reserve ANFIC's rights in relation to the deductible, although they took no effort to have Attorney Marchesi insert such language into the agreement that ultimately settled the class action suit.  Beyond these undisputed facts, the significance of other conduct is problematic.  It involves factfinding about the parties' intent and inferential knowledge of what others said and did.  In these circumstances it is conceivable that a fact finder might find the required misrepresentation and reliance to justify an estoppel remedy, but it is also conceivable

that a fact finder could conclude that the attorneys involved in these negotiations should have taken greater care.

York County also asserts, without any evidence or citation to support it, that "the insured and counsel for the insured operate on the commonly held practice that, unless the insurer expressly and clearly reserves its rights in the final settlement documents, those rights are waived." (Id.) Waiver, as York County notes elsewhere in its memorandum, is not the same thing as estoppel, see Roberts v. Me. Bonding & Cas. Co., 404 A.2d 238, 241 (Me. 1979), and estoppel is the only legal argument York County briefs.[7] Moreover, it seems a highly doubtful proposition that the settlement of third-party claims pressed in a lawsuit against an insured requires as a matter of law a full articulation in the settlement documents of any and all coverage disputes between the insured and its insurer. At the least, this is a proposition that needs greater evidentiary support than a plea that the court take judicial notice that the insurance company has "waived" its rights by not including them in that particular document. Indeed, the fact is that the settlement agreement does not address any rights and responsibilities running between York County and ANFIC.

Along the same line as the foregoing argument, York County asserts that "[i]t is elemental law that the insurer must clearly and expressly inform the insured of any policy

---

[7] The idea of waiver is interesting in relation to the reservation of rights letter. Having made an unmistakable reservation of rights in Mr. Curtin's January 2004 letter, it is worth pondering whether evidence of a subsequent, voluntary waiver would be needed in order to demonstrate that the reservation was ever legally waived. According to the defendant, the insured and the counsel for the insured operate on the commonly held practice that, unless the insurer expressly and clearly reserves rights in the final settlement documents, it has waived those rights. York County says this practice is so well established that the court can take judicial notice of it. That all sounds well and good to me, but I do not believe it is the sort of adjudicative fact that would be judicially noticed by a court. There may have been some "sharp practices" here, but I don't think the estoppel determination can be made on this summary judgment record. ANFIC's conduct in the Plymouth County case regarding reservations of its rights may be powerful evidence when juxtaposed with its conduct in this case, but it does not tip the summary judgment scale on the estoppel argument.

reservations or conditions." (Def.'s Mot. Summ. J. at 12.) The solitary citation to Roberts does not quite buttress such pontification. In Roberts the Law Court ruled that an insurer's knowledge of the uncertainty of a building's occupancy "might" create a duty to warn a prospective insured that coverage would be excluded by an extended vacancy, at least in a context where the prospective insured was shopping for appropriate insurance. Roberts, 404 A.2d at 242-43 (vacating judgment for insurer and remanding for further consideration of estoppel argument as the Court could not "say as a matter of law that the Defendant is estopped to assert the vacancy clause"). A similar, unsupported pontification is the following: "At the moment Attorney Marchesi memorialized all the terms of settlement by two letters dated November 23, 2004, ANFIC was legally required to notify Marchesi their offer was conditional." (Def.'s Mot. Summ. J. at 12-13.) It is conceivable that a fact finder might place more of the onus on York County to take reasonable notice of a reservation of rights previously expressed to the insured on at least two occasions, without just proceeding as though it was not validly expressed for some reason.

In the end, it is a conceivable finding on this record, drawing all available inferences in favor of ANFIC, the non-movant, that fair notice was provided to York County of ANFIC's reservation of rights apropos the deductible matter, and that either it was unreasonable for York County to assume that the reservation somehow evaporated, or York County chose to proceed with a settlement of the class action notwithstanding the uncertainty that remained as to its potential obligation to reimburse ANFIC for ANFIC's contribution toward the class action settlement fund.

**Conclusion**

For the reasons set forth above, I RECOMMEND that the Court GRANT

ANFIC's motion for summary judgment, IN PART, by entering an order that the

language of the LEL Coverage Form deductible provision is unambiguous and would

apply to multiple claims in the class action context, but otherwise denying ANFIC's

request for an entry of judgment in its favor on its complaint.  I also RECOMMEND that

the Court DENY York County's motion for summary judgment on both the contract

construction issue and the estoppel defense.

NOTICE

A party may file objections to those specified portions of a
magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C.  636(b)(1)(B) for which *de novo* review by
the district court is sought, together with a supporting memorandum, and
request for oral argument before the district judge, if any is sought, within
ten (10) days of being served with a copy thereof.  A responsive
memorandum and any request for oral argument before the district judge
shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the
right to *de novo* review by the district court and to appeal the district
court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

October 31, 2007