# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| AMERICAN NATIONAL FIRE INSURANCE COMPANY, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Docket no. 2:06-cv-200-GZS<br>)<br>) |
| YORK COUNTY, | )<br>)<br>) |
| Defendant. | ) |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

This matter came before the Court for a bench trial, which was held on May 8, 9 & 13, 2008. At the close of the trial, the Court ordered the parties to submit proposed findings of fact and conclusions of law as well as memoranda of law. The parties made their submissions on June 10, 2008 (Docket #s 102–105). In accordance with Federal Rule of Civil Procedure 52(a) and having reviewed the parties' post-trial submissions as well as the entire record, the Court now makes the following findings of fact and conclusions of law:

## I.    FINDINGS OF FACT

1.    Plaintiff American National Fire Insurance Company ("ANFIC")[1] insured Defendant York County for Law Enforcement Liability ("LEL") from November 1, 1996 through January 1, 1998.[2]

---

[1] ANFIC is a "sub-company" of Great American Insurance Companies. Thus, some of the evidence pertaining to ANFIC actually refers to "Great American" or "GAIC." Nonetheless, for the sake of simplicity and consistency, the Court's opinion refers solely to "ANFIC" using that term to describe all actions taken by Plaintiff in connection with this case.

[2] The fourteen months of coverage was the result of two policy periods: (1) November 1, 1996 to November 1, 1997 and (2) November 1, 1997 to January 1, 1998. Early on, there was disagreement between York County and ANFIC

2. The declarations page of the ANFIC Policy recited that coverage was subject to a "$5,000 Per Claim" deductible and also subject to an Occurrence Limit and Aggregate Limit of $1,000,000. (Ex. 34 at 54.)

3. As it relates to the issues presented here, the LEL Coverage in the ANFIC Policy included the following provisions:

> **SECTION I – LAW ENFORCEMENT LIABILITY COVERAGES**
> **A. Insuring Agreement**
> We will pay those sums that the Insured becomes legally obligated to pay as damages because of "wrongful act(s)" which result in:
> 1. personal injury;
> 2. bodily injury;
> 3. property damage;
> caused by an "occurrence" and arising out of the performance of the Insured's duties to provide law enforcement activities.
> . . . .
> We will have the right and duty to defend any "suit" seeking those damages. But:
> . . . .
> 2. we may, at our discretion, investigate any "wrongful act" and settle any claim or "suit" that may result . . . .
> . . . .
> The Insured shall not, except at his own cost and for his own account, make any payment, admit any liability, settle any claim, assume any obligations or incur any expense without our written consent.
> . . . .
> **C. Supplementary Payments**
> We will pay, with respect to any claim or "suit" we defend:
> 1. all expenses we incur;
> . . . .
> 3. all reasonable expenses incurred by the Insured at our request to assist us in the investigation or defense of the claim or "suit," . . . .
>
> **SECTION III – LIMITS OF INSURANCE**
> **A.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:
> . . . .
> 2. claims made or "suits" brought; or
> 3. persons or organizations making claim or bringing "suits."

---

as to whether the existence of two policy periods as compared to a single policy period increased the amount of coverage available. Ultimately, it appears that both sides agreed that the $1 million policy limit applied to the entire 14-month coverage period.

B. The Limit of Insurance shown in the Declarations applicable to each "occurrence" is the most we will pay for all claims arising out of the same act or interrelated acts of one of more of the Insureds. . . .

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than twelve (12) months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – LAW ENFORCEMENT LIABILITY CONDITIONS**
. . . .
**B. Deductible**
The deductible amount stated in the Declarations, if any, is applicable to each claim and shall be subtracted from the total amount of money damages and claims expenses including:
1. loss payments, and
2. investigation, adjustment, defense and/or appeal expenses, whether or not loss payment is made,
resulting from each claim and the Company shall be liable only for the difference between such deductible amount and the amount of insurance otherwise applicable to each claim.

**C. Duties in the Event of "Wrongful Act," Claim or "Suit"**
1. You must see to it that we are notified as soon as practicable of a "wrongful act" which may result in a claim. . . .
. . . .
2. If a claim is received by any Insured, you must:
a. immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";
. . . .
3. you and any other Involved Insured must:
. . . .
c. cooperate with us in the investigation, settlement or defense of the claim or "suit";
. . . .

**D. Legal Action Against Us**
. . . .
A person or organization may sue us to recover on an agreed settlement . . . . An agreed settlement means a settlement and release of liability signed by us, the Insured and the claimant or the claimant's legal representative.
. . . .
**I. Settlement**
We shall not settle any "suit" without insured's consent. If, however, the Insured refuses to consent to any settlement received by us, and shall elect to contest the claim or

3

continue any legal proceedings in connection with such claim, our liability for the claim shall not exceed the amount of which the claim could have been so settled . . . .

**SECTION V – DEFINITIONS**

. . . .

3. **"Occurrence"** means any event, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

6. **"Suit"** means a civil proceeding in which damages to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent.

(Ex. 34 at 81-85.)

4. In October 2002, three people, all of whom had been strip searched following their arrest and arrival at York County Jail, filed suit against York County on behalf of themselves and a class of others similarly situated. This case was brought in federal court and titled: <u>Nilsen et al. v. York County</u>, Civil Action No. 02-212-P-H (the "Nilsen Class Action" or the "Nilsen case"). (Ex. 1.) The Nilsen Plaintiffs sought to challenge York County's alleged practice of strip searching arrestees (who had not been convicted of any crime) without any finding of reasonable suspicion.

5. At that time, York County's LEL carrier was the Maine County Commissioners Association Risk Pool (the "Risk Pool") and York County notified the Risk Pool of the claim. The Risk Pool undertook the defense of York County after issuing a reservation of rights letter dated August 11, 2003. (Ex. 2.)

6. The Risk Pool retained Attorney Peter Marchesi to defend York County in the Nilsen Class Action. At various times, the defense team also included Attorney John Wall and Attorney Harry Richardson.

7.      The Risk Pool also retained Jim Poliquin as its own counsel on coverage issues. In June 2004, York County retained Attorney Gene Libby to serve as its individual counsel in connection with the Nilsen Class Action.

8.      After the District Court certified the class in late 2003, the issue of class certification in the Nilsen case went up on interlocutory appeal. The First Circuit affirmed, thereby allowing the case to continue as a class action. See Nilsen v. York County, 219 F.R.D. 19 (D. Me. 2003), aff'd sub nom. Tardiff v. Knox County, 365 F.3d 1 (1st Cir. 2004).

9.      While the interlocutory appeal was pending, York County identified two other insurers that provided LEL coverage during periods covered by the Nilsen Class Action: ANFIC and Twin Cities Insurers Company ("Twin Cities"). York County provided notice of the Nilsen Class Action to both insurers.

10.     Ultimately, both ANFIC and Twin Cities agreed to participate in a coordinated defense of the Nilsen Class Action. As a member of the coordinated defense team, ANFIC agreed to pay 25 percent of the defense costs.

11.     ANFIC commenced its participation in the defense after issuing a reservation of rights letter on or about January 22, 2004. In that letter, Adjuster William Curtin stated in part:

> We would also bring to your attention the language contained within the deductible section of the policy as referenced above. Pursuant to the language of this portion of the policy, the $5,000 deductible will apply to each claim brought for illegal strip search within the coverage period.
>
> Therefore, for these and other good and valid reasons, [ANFIC] will be participating in the defense of York County under a full Reservation of Rights under the terms of the Law Enforcement Liability policy referenced above.

(Ex. 3 at 6-7.) This reservation of rights letter was never explicitly withdrawn.

12.     In a letter dated June 15, 2004, Attorney Marchesi wrote to representatives for all three York County insurers (the Risk Pool, ANFIC and Twin Cities) as well as York County to clarify

his role as counsel for Defendant in the Nilsen Class Action and explaining that he would not and could not be involved in coverage issue disputes between the three insurers and York County. Marchesi explained, in part, "It is our understanding that all three [insurers], while agreeing to participate in the defense of the litigation, have identified coverage issues and reserved their rights to deny indemnification to York County. . . . To the extent that the county or any of the insurers need advice or guidance with respect to coverage matters, they must retain the services of independent counsel of their choosing." (Ex. 5 at 1-2.)

13.     Prior to mediated settlement discussions in the Nielsen Class Action, there was a meeting of the defense group on or around September 14, 2004. The meeting was held at the offices of Attorney Richardson; Attorney Marchesi, Attorney Richardson, Attorney Wall attended as well as representatives for York County and each insurer. Specifically, York County was represented by Attorney Libby, County Manager David Adjutant and Chairman of the York County Commissioners William Layman. The Risk Pool was represented by Malcolm Ulmer and Attorney Poliquin. ANFIC was represented by William Curtin. Twin Cities was represented by an unnamed adjuster.

14.     At this meeting, Attorney Marchesi indicated that a settlement was needed because they were faced with a large class and liability was near certainty. Marchesi estimated that the damages awarded would far exceed all available insurance and that there would be "very significant" litigation costs associated with discovery and individualized damages hearings. (Tr. 47.) On behalf of York County, Attorney Libby explained that besides the available insurance, the County had less than $100,000 available to contribute to any settlement.

15.     Following the September 14, 2004 defense group meeting, ANFIC's internal claim notes reflect that Mr. Curtin recommended adjusting the reserves on the Nielsen Class Action claim up

to the coverage limit. This recommendation was based on Curtin's estimate of 1,000 class members for the ANFIC Policy period and an average payment of $8,800 per class member claim. (See Tr. 181-83 & Ex. 35 at 42.)

16. In addition to the $1 million policy limit, Curtin was concerned about rising defense costs; since under the terms of the ANFIC policy, defense costs were supplementary and there was no cap. Thus, pursuant to its agreement to pay 25 percent of the defense costs of the Nilsen Class Action, Curtin thought ANFIC potentially faced exposure for defense costs far in excess of $1 million.

17. In preparation for the mediation, both sides prepared mediation memoranda. Plaintiffs' Mediation Memorandum, dated September 17, 2004, estimated that the Nilsen Class had over 8,000 members. If the Nilsen case was tried through damages, Plaintiffs' Memo gave an estimated damages verdict of $22 million and estimated the Plaintiffs' fees and expenses at $11,125,000 and York County's own litigation costs as exceeding $30 million. (Ex. 7.) In other words, Class Counsel estimated Defendant's exposure for a trial in the Nilsen Class Action as exceeding $63 million.

18. The first mediation session for the Nilsen Class Action was held on September 20, 2004. Attorney Marchesi acted as the principal negotiator for York County. Nonetheless, all members of the defense group were individually represented with ANFIC represented by William Curtin. At the session, Curtin restated ANFIC's position that its coverage was subject to a $5,000 per claim deductible and also asserted that ANFIC's contribution to any settlement should be limited to approximately 15 percent given its limited coverage over the eight year period covered by the Nilsen case. No settlement with the Nilsen Class was reached at this session but the defense

group felt that it had achieved an agreement that "any settlement must be negotiated within the existing insurance and risk pool coverage." (Ex. 10.)

19.     Following the first mediation session, Attorney Libby, acting as coverage counsel for York County, wrote Curtin.  In that letter, Libby acknowledged ANFIC's position "that each class member must satisfy the policy based $5,000 deductible limit," but also explained that York County viewed the $5,000 deductible as applying "to the entire class and not individual class members."  (Ex. 10.)  Regardless of this ongoing disagreement between York County and ANFIC regarding how the deductible would apply if the Nilsen case were tried to a verdict, Attorney Libby's letter went on to explain that even under ANFIC's interpretation it was likely that a judgment in the Nilsen Class Action might exhaust the entire $1 million policy limit. Thus, Libby, on behalf of York County, asked that the entire $1 million be made available "to conclude negotiations with plaintiffs" at the second mediation session. (Id.)

20.     By letter dated September 27, 2004, Attorney Dowd, acting as counsel for ANFIC, responded to Attorney Libby's letter.  Dowd explained that York County's "position that the 'per claim' deductible applies to the entire class, rather than individual class members is respectfully but unequivocally rejected." (Ex. 11.)

21.     A second mediation session was held on September 29, 2004.  This second mediation did not result in a settlement with the Nilsen Class.  However, there was progress and by the end of the session, each member of the defense group had increased its contribution to a proposed settlement. Specifically, by the end of the second session, the Risk Pool had offered $1.85 million, Twin Cities had offered $10,000, ANFIC had offered $650,000, and York County had offered $25,000.  These offers were made within the defense group and not disclosed to Nilsen Class Counsel during the second mediation session.

22.     While offering to contribute $650,000 towards the settlement, Curtin, acting on behalf of ANFIC, did not communicate any restrictions on this contribution or mention that ANFIC would seek reimbursement based on the deductible provisions of the policy.

23.     Following the second mediation session, settlement discussions continued and Attorney Marchesi ultimately made a settlement offer on behalf of the defense group of $2.9 million, which Attorney Marchesi believed included $650,000 previously offered by Mr. Curtin at the end of the second mediation session.

24.     Attorney Marchesi ultimately withdrew the $2.9 million offer by letter dated October 19, 2004 after receiving correspondence from Mr. Curtin indicating that ANFIC would only contribute $650,000 if the total settlement being offered was $3.25 million or greater.  (Ex. 15.)

25.     Upon being notified of the offer made by Attorney Marchesi, Attorney Dowd, counsel for ANFIC, sent Attorney Marchesi a letter dated October 21, 2004, in which Dowd indicated that ANFIC had not authorized a $650,000 contribution to any settlement of the Nilsen Class Action. Dowd's letter ultimately went on to explain that he was now authorizing a $650,000 ANFIC contribution toward a settlement.  (Ex. 21.)

26.     On October 21, 2004, Attorney Dowd also sent a separate letter to Attorney Libby in which he again laid out the ANFIC argument that ANFIC would only be liable "for loss in excess of $5,000 [on] each claim."  (Ex. 19 at 3.)  This letter was not copied to other members of the defense group or to Attorney Marchesi.

27.     By letter dated October 25, 2004, Attorney Marchesi responded to Dowd's letter to him asserting that Curtin had in fact authorized the $650,000 contribution.  Marchesi's letter also went on to again explain his view that ANFIC's potential exposure in the case exceeded $1 million even if ANFIC's argument that the policy required a $5,000 deductible per class member

9

were accepted. (Ex. 22.) Attorney Libby also similarly responded to Attorney Dowd by letter dated October 26, 2004. (Ex. 20.) Both of these letters were copied to all members of the defense group.

28. Following this exchange of letters, Attorneys Marchesi, Libby and Dowd participated in a conference call on or about October 29, 2004. Attorney Libby scheduled the call in hopes of persuading Dowd to increase ANFIC's contribution in order to finalize a settlement of the case. The deductible issue was not raised or discussed during this call, which lasted just under one hour. Following this call, Attorney Dowd called Attorney Marchesi and gave him authority to settle with an ANFIC contribution of $750,000, provided that all other members of the defense team contributed the amounts that had been previously discussed.

29. Prior to Attorney Dowd's authorization, William Curtin had received approval for a $750,000 contribution from the ANFIC's claims committee. The claims committee did not impose any conditions on that authority or suggest that the $750,000 could only be made subject to the deductible.

30. With the $750,000 contribution from ANFIC, York County was able to achieve a settlement of the Nilsen Class Action in exchange for establishing a $3.3 million settlement fund. The York County Class Action Settlement Fund was funded by the following contributions from each member of the defense group:

- $2.4 million from the Risk Pool,
- $750,000 from ANFIC,
- $100,000 from Twin Cities, and
- $50,000 from York County.

31.     An express condition of the settlement with the Nilsen Class was that counsel for York County would "provide an affidavit and/or testimony regarding the relative lack of assets available to fund a settlement that [exceeded $3.3 million]." (Ex. 23.)  Attorney Dowd was copied on the November 23, 2004 letter laying out this condition and all other terms of the settlement reached with counsel for the Nilsen class.

32.     ANFIC never responded to this letter by filing any objections or clarifying any conditions that it wished to impose on its $750,000 contribution to the settlement.

33.     ANFIC sent a check for $750,000 on or around February 1, 2005; no conditions or reservations were included with the check.  At no time before filing this action did ANFIC characterize its contribution to the settlement of the Nilsen Class Actions as 'an advance of its deductible' or suggest that its contribution was anything other than a simple contribution towards the settlement of the Nilsen Class Action in its entirety.

34.     The Court gave its final approval to the Nilsen Class Action settlement on September 8, 2005.  See Nilsen v. York County, 400 F. Supp. 2d 265, 266 (D. Me. 2005).  The final Nilsen Settlement Agreement was signed on behalf of York County by Attorney Marchesi and Attorney Wall.  In relevant part, it contained a release for York County, ANFIC and all other insurers that were part of the defense group. (Ex. 32.)

35.     Under the terms of the settlement, this release applied to all "class members' claims for unlawful strip searches . . . including class members who do not file claims."  (Ex. 32 at 14.) Thus, regardless of whether a class member received a distribution from the York County Class Action Settlement Fund, the settlement extinguished all claims by arrestees who were subjected to a unlawful strip search at the York County Jail between October 14, 1996 and April 30, 2004.

36. There was no agreement or attempt to reach an agreement between ANFIC and York County as to how the contributions of each party would be traced and counted towards any payments made for class members who were strip searched during the ANFIC policy period (November 1, 1996 – January 1, 1998). However, ANFIC was well aware that it was York County's position that the County has already exhausted its available funds via its own $50,000 contribution to the York County Class Action Settlement Fund.

37. In prior settlements involving unresolved coverage issues, William Curtin made it his practice to ensure there was agreement to table the coverage issue and resolve it once the settlement was finalized. Curtin followed this practice in 2003 when settling the case of <u>Connor v. Plymouth County Sheriff's Department</u>. (Ex. 36.)

38. If York County had known of ANFIC's intention to seek reimbursement of its entire $750,000 contribution, York County would not have agreed to the Nilsen Class Action settlement as proposed in November 2004.

39. None of the named plaintiffs in the Nilsen Class Action were subjected to strip searches during the ANFIC Policy period. Ultimately, 1,410 claimants were approved to receive payments from the Nilsen Class Action Settlement Fund. Each of those 1,410 claimants received a payment of $1,719.08.

40. No claimants strip searched during the ANFIC policy period received more than $5,000 (including each claimant's share of attorney's fees and costs). According to ANFIC's calculations, only 273 of the 1,410 claimants were strip searched during the ANFIC policy period. There is no evidence regarding how many claims from the ANFIC policy period were actually extinguished as a result of the Nilsen Class Action Settlement.

## II.     CONCLUSIONS OF LAW

1.     The LEL Policy at issue in this matter unambiguously called for York County to pay a $5,000 deductible on each claim under the policy.  This Court previously resolved via summary judgment the parties' dispute regarding the meaning of "claim" by holding:  "the language of the LEL Coverage Form deductible provision is unambiguous and would apply to multiple claims in the class action context." (Order Affirming Rec. Dec. (Docket # 50) at 2.)  Thus, the starting point for the bench trial was that the ANFIC LEL Policy required York County to pay up to $5,000 on each claim for an illegal strip search that occurred between November 1, 1996 and January 1, 1998.

2.     Although the Policy language with respect to the deductible is clear, it is far from clear what role the deductible can or should play in the context of the contributions made by both ANFIC and York County to the York County Class Action Settlement Fund.  The Policy itself is silent as to how contributions by the insurer and insured to a claims-made settlement fund should be treated for purposes of calculating any deductible.

3.     Under the terms of the Nilsen Class Action settlement, there were multiple contributors to the settlement fund and many variables, especially the size and make-up of the class as a whole and the subset of class members that would be paid from the claims-made settlement fund.  In light of all of these variables and complexities, it is entirely unclear how to apply the deductible provision of the ANFIC LEL Policy.  In short, damages for any breach of the deductible provision are uncertain; these uncertainties include: (1) whether the "claims" should include only those persons who were strip searched during the ANFIC Policy period that received payments or all those claims from during the ANFIC Policy period that were extinguished by the settlement, (2) what credit, if any, York County should receive for its own $50,000 contribution

to the settlement fund and (3) how to divvy up the fees and expenses paid out of the settlement fund, which totaled approximately $935,000.

4. Regardless of the how the deductible provision of the Policy should apply to this unique class action settlement, the Court finds that Defendant York County has established by a preponderance of the evidence that there was an accord and satisfaction between York County and ANFIC in 2004.

5. Alternatively, Defendant York County has also established the affirmative defense of equitable estoppel; that is, York County established by a preponderance of the evidence that the conduct of ANFIC misled the County into acting on a reasonable belief that ANFIC was waiving its reserved rights to seek reimbursement of any deductible when it contributed $750,000 to the settlement of the York County Jail class action.

6. Plaintiff's argument that Defendant somehow waived any affirmative defenses that were not pursued and briefed in its summary judgment motion is without merit.[3]

## III. DISCUSSION

Ultimately, this case presents a settlement within a settlement. Because both York County and ANFIC were understandably more focused on finalizing the Nilsen case settlement,

---

[3] Plaintiff makes this argument in a footnote of its post-trial brief and Defendant's post-trial brief devotes a mere paragraph to the issue of whether it abandoned any affirmative defenses. Thus, the Court limits its own discussion of the argument to this footnote. In short, a defendant who chooses not to argue a particular affirmative defense in opposing summary judgment certainly risks the potential that summary judgment may be granted, thereby preventing them from being able to pursue that defense due to the summary judgment ruling. However, a defendant is entitled to take that risk, especially if they believe that a particular defense is not amenable to summary judgment or relevant to the summary judgment argument presented by the plaintiff. A rule that required a defendant to raise each and every affirmative defense in objecting to summary judgment or deem the defenses waived even if the case survived summary judgment would only encourage "kitchen sink"-styled objections to summary judgment that would defeat the intended efficiencies of summary judgment practice. To the extent that Plaintiff has relied in United States v. Mottolo, 26 F.3d 261, 263 (1st Cir. 1994) in suggesting that such a rule exists in the First Circuit, this Court does not believe that Mottolo announced such a rule or that the First Circuit would hold that defenses preserved in a defendant's answer but not raised in objecting to summary judgment are categorically waived to the extent the case survives summary judgment.

which required court approval, the details of their own settlement received far less attention (until the commencement of this litigation). The record presented to this Court establishes a genuine disagreement between ANFIC and York County as to how the deductible provision would be applied in the context of this class action case. As ANFIC knew, York County believed its maximum deductible exposure for the entire Nilsen Class Action was $5,000 (to the extent that liability was covered under the ANFIC LEL Policy). While ANFIC makes much of the fact that it never affirmatively withdrew its initial reservation of rights and that it continued to press for its broader reading of the deductible provision through October 21, 2004, the fact remains that York County also never backed away from its position that its deductible liability to ANFIC was no more than $5,000 total. In other words, both sides engaged in posturing on the deductible issue up until the time of the settlement.

ANFIC would have the Court believe that it reasonably made a $750,000 contribution to the settlement without seeking any clarification as to how the deductible provision would be applied under their view that the Nilsen case encompassed multiple claims each subject to a $5,000 deductible.[4] In essence, ANFIC's $750,000 offer was a calculated gamble in which they were more likely than not going to be entitled to reimbursement of all of the $750,000, with a minute chance they would be entitled to only $5,000.[5] On the record presented, the Court concludes that: (1) ANFIC did not in fact intend to gamble when it offered to contribute $750,000 to the York County Class Action Settlement Fund and later tendered that amount, and (2) that, regardless of ANFIC's intentions, it was unreasonable for ANFIC as the insurer to

---

[4] Notably, to the extent any portion of the $750,000 contribution was considered a deductible advance and simply not being discussed, such an advance was easily calculated under York County's reading of the deductible provision, that is: $5,000.

[5] As explained in Plaintiff's Post-Trial Brief, "[h]ad a single claimant recovered the $750,000, all but $5,000 would have been borne by ANFIC." (Pl.'s Post-Trial Br. (Docket # 103) at 3.) Indeed, so long as there were more than 150 claimants, the pay out to each would have easily been below the $5,000 mark. (See id.)

15

"gamble" in this manner without explicitly disclosing its position to the insured, who, in the absence of any such disclosure, reasonably believed that its own $50,000 contribution to the York County Class Action Settlement Fund was the maximum extent of its payment under the terms of the settlement. These factual conclusions establish two defenses recognized under Maine law and the Court proceeds to discuss each in turn.

### A. Accord & Satisfaction

"An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty." Restatement (Second) of Contracts § 281. Under Maine law, "[a]ccord and satisfaction is an affirmative defense, . . . and the party asserting an accord and satisfaction has the burden of showing that an accord and satisfaction has occurred by a preponderance of the evidence." E.S. Herrick Co. v. Maine Wild Blueberry Co., 670 A.2d 944, 946 (Me. 1996). "The existence of an accord and satisfaction is a question of fact unless it is evidenced by a clear and unambiguous writing." Premier Capital, Inc. v. Doucette, 797 A.2d 32, 35 (Me. 2002). The Law Court has further explained that an accord "may be implied from the circumstances and conduct of the parties." Soucier v. Wall, 581 A.2d 422, 424 (Me. 1990).

In this case, an accord is easily inferred from the circumstances and conduct of the parties. Under the ANFIC LEL Policy, York County was responsible for the first $5,000 of any claim made under the Policy and ANFIC was financially responsible for all amounts on a claim above that deductible up to $1 million as well as defense costs. In light of the disagreement and uncertainty as to the number of claims involved in the Nilsen Class Action, the parties agreed to a substitute performance; namely, ANFIC would contribute $750,000 to a settlement fund and York County would contribute $50,000 to that same settlement fund. Both parties performed as

16

indicated and thus any duty regarding the payment and/or reimbursement of a deductible in any amount was discharged.

An accord and satisfaction would not be found if ANFIC had explicitly reserved its rights regarding the deductible either at the time the parties were agreeing on the various contributions to the York County Class Action Settlement Fund or, later, when it tendered its $750,000 contribution. But, the fact remains that the last time ANFIC pressed its deductible argument was October 21, 2004. During the finalizing of the settlement, which occurred between October 29, 2004 and November 23, 2004, ANFIC did not seek any clarification as to how the deductible would be reimbursed or reiterate its reservation of rights. In fact, through the settlement process, ANFIC was well aware of York County's position that its maximum contribution to any settlement of the Nilsen case had to be capped to $50,000, and ANFIC ultimately made its own offer of $750,000 contigent on York County contributing $50,000 to the Settlement Fund.

This contribution by ANFIC followed York County pressing its argument that ANFIC would likely be required to pay the policy limit—even if its reading of the deductible provision was correct. The fact that ANFIC took steps to increase its own reserve to the policy limit after York County pressed this argument shows that ANFIC understood its exposure even under its view of the deductible absent a settlement of the Nilsen Class Action. In addition, there is no evidence that ANFIC considered its $750,000 contribution to be an advance at the time it offered the contribution. Even the internal communications within ANFIC at the time are devoid of any suggestion that ANFIC was planning to recoup a deductible at a later date. Rather, the preponderance of the evidence amply proves that, at the time the settlement was being finalized, ANFIC was simply satisfied to cap its exposure at $750,000 plus the 25 percent of already incurred defense costs.

In short, the Court is satisfied that Defendant has proven the defense of accord and satisfaction by a preponderance of the evidence.[6]

### B. Estoppel

"It is, in fact, estoppel which applies where the conduct of the insurer has misled the insured into acting on a reasonable belief that the insurer has waived some provision and extended coverage." Roberts v. Maine Bonding & Cas. Co., 404 A.2d 238, 241 (Me. 1979) (footnotes & citations omitted). The insured bears the burden of proof when asserting the defense of estoppel. See Maine Mut. Fire Ins. Co. v. Grant, 674 A.2d 503, 504 (Me. 1996). The two elements of estoppel to be proved are: "(1) unreasonable conduct of the insurer which misleads the insured concerning the scope of his coverage and (2) justifiable and detrimental reliance by the insured upon that conduct of the insurer." Id.; Roberts, 404 A.2d at 241. "The reliance necessary for estoppel must be reasonable." Roberts, 404 A.2d at 241.

### 1. Unreasonable Conduct

ANFIC argues that "[i]t defies credulity" that the Court could deem its "good faith" $750,000 contribution "unreasonable conduct." (Def.'s Post-Trial Br. (Docket # 103) at 3.) Of course, what makes ANFIC's conduct unreasonable is not the willingness to contribute $750,000, but simply its failure to disclose that the $750,000 was not the contribution it appeared to be. Since ANFIC now asserts it intended to recoup its contribution the entire time, the

---

[6] Defendant York County invokes the Law Court's decision in Butters v. Kane, 347 A.2d 602 (Me. 1975), in which the Law Court held that "the making of a settlement without any express reservation of rights constitutes complete accord and satisfaction of all claims of immediate parties to the settlement arising out of the same accident. Id. at 604. However, the Law Court has also made clear that the Butters rule applies only to those who are "immediate part[ies] to the release." See Brown v. Manchester, 384 A.2d 449, 453 (Me. 1978). In this case, the releasor in the Nilsen case was the Plaintiff Class, not York County. Moreover, ANFIC was not an immediate party to the settlement agreement signed in the Nilsen Class Action. The immediate party to the agreement was York County (although the text of the agreement included as releasees both ANFIC and York County). These differences place this case outside the Butters rule and, thus, the Court does not rely on the Butters rule in finding an accord and satisfaction in this case. Nonetheless, the Butters rule explains only one of many varieties of accord and satisfaction. Although the unique facts of this case make Butters inapposite, the facts still satisfy the elements for an accord and satisfaction as described above.

18

$750,000 contribution to the settlement was apparently illusory. Given the complexity of the settlement and the context of the ongoing negotiations, it was unreasonable for ANFIC to not explicitly reserve its rights when it offered the $750,000 contribution and/or to attempt to reach an explicit agreement with York County as to how any refund of the deductible advance would be calculated. ANFIC was well aware that York County and all other members of the defense group believed that ANFIC's exposure in the case easily exceeded $1 million with its share of the defense costs. In addition, ANFIC only agreed to increase its contribution from $650,000 to $750,000 after additional cajoling and internal deliberation. Even then, ANFIC made its contribution contingent only on all other members of the defense group contributing as laid out in the November 23, 2004 letter. Under these circumstances, no reasonable insured would have believed that ANFIC's $750,000 contribution was simply a loan or an advance of the deductible.

In fact, the preponderance of the evidence suggests that ANFIC's decision to seek deductible reimbursement from York County was a strategy developed ex post facto. In other words, ANFIC decided to gamble with its $750,000 contribution not at the time it was offered, but much later when it decided to pursue this case against York County.

### 2. Justifiable and Detrimental Reliance

York County justifiably and detrimentally relied on ANFIC's misleading offer. The evidence showed that York County could not and would not have proceeded with a settlement that required it to pay up to $800,000 in November 2004. Rather, York County would have continued to negotiate with ANFIC, its other insurers and the Plaintiff Class to further limit its exposure. See, e.g., Connelly v. Home Life Ins. Co., 432 A.2d 1235 (Me. 1981) ("The conduct relied upon must have induced the insured 'to do what resulted to his detriment, and what he would not otherwise have done.'") (quoting Roberts v. Maine Bonding & Cas. Co., 404 A.2d

19

238, 241 (Me. 1979)). The fact that a prior settlement offer was withdrawn upon ANFIC claiming it had not authorized its $650,000 contribution shows that the entire settlement depended on ANFIC's contribution. Perhaps the most compelling evidence of York County's reliance is the undisputed fact that the settlement explicitly depended in part on York County indicating to the Court that it lacked assets that would allow it to contribute more than $50,000 to the York County Class Action Settlement Fund. Clearly, if the County had additional assets to refund all or some of ANFIC's $750,000 contribution to the settlement, York County could not and would not have offered to have its counsel make such a representation to the Court approving the settlement of the Nilsen case.

In short, given the context of the settlement negotiations and the various representations York County made regarding its own ability to pay into any settlement, the preponderance of the evidence shows that York County detrimentally, justifiably and reasonably relied on ANFIC's misleading offer. Thus, while the Court believes that the preponderance of the evidence suggests that the parties reached an accord and satisfaction during the settlement of the Nilsen Class Action in late 2004 and early 2005, the Court alternatively finds that in the absence of an accord, York County has also established the affirmative defense of estoppel.

## IV. CONCLUSION

Based on the above findings and conclusions, the Court hereby ORDERS Judgment be entered in favor of Defendant York County.

SO ORDERED.

/s/ George Z. Singal
Chief U.S. District Judge

Dated this 20th day of October, 2008.